Whitaker, Judge,
delivered the opinion of the court:
This case involves an alleged misrepresentation in the sale of surplus property by the War Assets Administration. Some details of the facts leading up to the misrepresentation are helpful as background, though not much relevant to the controversy. They will be stated first.
During World War II the Southeastern Shipbuilding Corporation operated a shipyard for the defendant near Savannah, Georgia. The shipyard was bisected by tracks of the Atlantic Coast Line Eailroad. The ground on the east of the tracks was owned by defendant; the ground on the west had been leased by defendant from the Atlantic Coast Line Eailroad. All the buildings, machinery, and equipment on both sides of the tracks were owned by defendant.
The shipyard was discontinued after the cessation of hostilities. On November 28, 1947 all the property on the east of the railroad, both real and personal, was sold by defendant to the Savannah Port Authority for the Harbor and Port of Savannah, hereafter referred to as the Port Au *619 thority. On the same day defendant sold to the Port Authority its personal property on the west side of the tracks, with certain exceptions. This personal property on the west of the tracks was in turn sold by the Port Authority to the South Atlantic Metals Company.
The foregoing is background. The facts upon which the case is to be decided follow:
Nearly six months after the foregoing transactions the War Assets Administration sold to plaintiff what appears to be the remainder of its property at the shipyard. Included therein was the property in dispute, described as follows:
31. Electrical Distribution System — including all primary and secondary lines, transformers, receptacles, poles, flood lighting and other appurtenant facilities as now located within the area of property owned by the Atlantic Coast Line Railroad.
The sale was the result of an invitation for bids, plaintiff’s bid, and the subsequent negotiations between the parties looking to an increase in the amount of plaintiff’s bid, which culminated in a contract between plaintiff and defendant, which made the terms of the invitation for bids a part thereof.
The invitation for bids recited in part:
* * * Information regarding those buildings or facilities claimed by priority holders may be obtained at War Assets Administration, Office of Real Property Disposal, 699 Ponce DeLeon Avenue, N. E., Atlanta 5, Georgia. The descriptions and locations are believed to be correct but any error or omission in the description of the property shall not constitute any ground or reason for nonperformance of the contract of sale or claim by the purchaser for any allowance, refund or deduction from the purchase price.
* $ # * $
This invitation to bid, and acceptance by the Government shall constitute the entire contract of sale between the successful bidder and the Government.
The buildings and facilities are now subject to inspection by prospective purchasers. The failure of any bidder to make such inspection or to be fully informed as to condition of the structures and premises will not constitute grounds for any claim for adjustment or for *620 the withdrawal of his bid. Upon request, arrangements for such inspection will be made.
The buildings and facilities offered for sale for removal for off-site only will be sold “as is” and “where.is” without warranty or guaranty as to quantity, quality, character, condition, size, or kind, or that the same are in condition or fit to be used for the purpose for which intended and no claim for any allowance or deduction upon such grounds will be considered after the bids have been opened. * * *
Information as to the meaning of the provisions, of this Invitation for Bids and any additional information required should be obtained from the War Assets Administration.
As suggested in the invitation for bids, plaintiff’s representatives went to the office of the War Assets Administration to secure further information relative to the property offered for sale. They were shown drawings indicating, among other things, the location on the ground of the “electrical distribution system.” They were told they could secure copies of these drawings and further information from the guards at the site. They went to the site, were furnished copies of the drawings, and were shown around by the guards. At least three of plaintiff’s representatives made an inspection of the property. One of them spent four days there.
What plaintiff was particularly interested in was the copper cable in the “electrical distribution system.”
Plaintiff discovered that the transformers, included in the “electrical distribution system,” had been removed, but that the wires, which had led from them and went underground to the powerhouse and elsewhere, were sticking up out of the ground. The ends of these wires were also sticking up out of the ground at the other end of the line. The drawings which defendant had furnished plaintiff showed the course and the length of the distribution system, and from them and from an inspection of the ends of the cables sticking out of the ground plaintiff was able to compute with reasonable accuracy the amount of pounds of copper it would be able to secure from the cables.
In reliance upon this information, it submitted its bid, which it later increased after negotiation with defendant. (It did not include in its bid anything for the transformers offered for sale, because they had been removed.)
*621 The cable, which plaintiff wanted especially, was buried in the ground at depths of from four to sis feet. To remove it plaintiff attached to the ends of the cable sticking out of the ground heavy machinery designed to pull it upward and rip it out of the ground.
To its surprise, it discovered that the cable underground extended but a few feet from the ends sticking up above ground. The balance had been removed. Whereas plaintiff had estimated it would be able to secure 375,000 pounds of copper from the underground cable and the secondary cable above ground, it was able to secure only 119,580 pounds.
It sues because it says the defendant misled it. We think this is true, although it was not intentional.
Plaintiff was furnished drawings showing the electrical distribution system; it was invited to visit the site to inspect the property to be sold; this inspection gave plaintiff no reason to suspect that the system was anything other than that shown on the drawings. The ends of the cables at each end of the system were sticking up out of the ground at the places where the drawings indicated they went underground. There was nothing on the surface of the ground to indicate that they did not continue underground as the drawings showed they did. The surface of the ground over their course underground was overgrown with grass and weeds and gave no indication that the intermediate cable had been removed.
Defendant sold the property to plaintiff “as is” and “where is”, “without warranty or guaranty as to quantity, quality,” etc.; but it furnished plaintiff with drawings showing the location and the course of the system and invited it to visit the site to ascertain what was there. This visit confirmed to it what the drawings showed. It would have done so to any careful, prudent person. Plaintiff was misled, and defendant was the cause of it. Plaintiff is entitled to recover its resultant damages.
Plaintiff estimated it would be able to remove 375,000 pounds of copper. This was a fair estimate. The superintendent of the electrical company which laid the cable estimated its weight at from 320,000 to 400,000 pounds, and gave 360,000 pounds as his best estimate. The foreman of the *622 company which laid it estimated its weight at from 350,000 to 360,000 pounds. The plaintiff recovered 119,580 pounds.
The Commissioner’s report states there was a deficit in what plaintiff had a right to expect of 220,000 pounds. He also found that the fair value of the cable at the time of the sale was 16 cents a pound, and that the cost of salvaging it was $5,200.00. Neither party excepts to these findings, and they are, therefore, adopted by the court.
The result is, plaintiff is entitled to recover $30,000.00. Judgment for this amount will be entered.
Howell, Judge; Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.